UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ─────────────────────────── x | | |
| CLAUDE A. REESE, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:08-cv-07202-PKC |
| Plaintiff, | : : | LEAD PLAINTIFF'S MOTION TO PARTIALLY LIFT PSLRA DISCOVERY |
| vs. | : : | STAY AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT |
| THE MCGRAW-HILL COMPANIES, INC., HAROLD MCGRAW III, and ROBERT J. BAHASH, | : : : : | THEREOF |
| Defendants. | : : | |
| ─────────────────────────── x | | |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND .........................................................................................................4

III.   ARGUMENT .............................................................................................................11

     A.    Courts Have Explicit Authority to Modify the PSLRA's Discovery Stay ............11

     B.    Courts Routinely Modify the Discovery Stay under Similar Circumstances ........12

     C.    Plaintiff's Proposed Discovery Is "Particularized" ...............................................14

     D.    Plaintiff Will Be Unduly Prejudiced Without Modification of the PSLRA Stay ......................................................................................................................14

     E.    Modification of the PSLRA Discovery Stay Will Not Impose an Undue Burden on Defendants ...........................................................................................16

IV.   CONCLUSION ..........................................................................................................19

## TABLE OF AUTHORITIES

**CASES**

*In re AOL Time Warner, Inc. Sec. Litig.*,
No. MDL1500 (SWK) 2006 WL 1997704 (S.D.N.Y. July 13, 2006)..............................15

*In re  Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
No. 05-MD-1725, 2007 U.S. Dist. LEXIS 10408 (E.D. Mich.
Feb. 15, 2007) .................................................................................................11, 13, 14, 15

*In re Enron Sec. Derivative & "ERISA" Litig.*,
No. MDL 1446, H-01-3624, 2002 U.S. Dist. LEXIS 26261 (S.D. Tex. Aug.
16, 2002) ........................................................................................................12, 18, 19

*In re FirstEnergy Corp. Sec. Litig.*,
229 F.R.D. 541 (N.D. Ohio Jan. 26, 2004).........................................................12, 15, 17

*In re LaBranche Sec. Litig.*,
333 F. Supp. 2d 178 (S.D.N.Y. 2004).......................................................................18, 19

*In re  Royal Ahold N.V. Sec. & ERISA Litig.*,
220 F.R.D. 246 (D. Md. 2004).........................................................................................15

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
No. 04-374 (JWB) 2005 U.S. Dist. LEXIS 37962 (D.N.J. Feb. 15, 2005).......................12

*In re Tyco Int'l, Ltd. Sec. Litig.*,
No. MDL00-MD-1335-B,  2000 U.S. Dist. LEXIS 11659 (D.N.H. Jan. 29,
2003) ................................................................................................................................14

*In re Williams Sec. Litig.*,
No. 02-CV-72H (M), 2003 U.S. Dist. LEXIS 24304 (N.D. Okla. May 22,
2003) ................................................................................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
234 F. Supp. 2d 301 (S.D.N.Y. 2002)............................................................12, 15, 16, 17

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
No. 03 Civ. 6942 (SAS), 2005 U.S. Dist. LEXIS 2388 (S.D.N.Y. Feb. 17,
2005)  ...............................................................................................................................12

*Singer v. Nicor, Inc.*,
No. 02C5168,  2003 U.S. Dist. LEXIS 26189 (N.D. Ill. Apr. 23, 2003)..............12, 15, 17

*Vacold LL & Immunotherapy, Inc. v. Cerami*,
No. 00Civ.4024 (AGS), 2001 WL 167704 (S.D.N.Y. Feb. 16, 2001) ..............................13

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78u-4(b)(3)(B)................................................................................11, 14, 15, 17

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 104-369 (1995).......................................................................11, 12

S. Rep. No. 104-98 (1995)...........................................................................................13

Lead Plaintiff, the Boca Raton Firefighters and Police Pension Fund ("Boca Raton F&P Fund" or "Lead Plaintiff"), respectfully moves this Court for entry of an Order partially lifting the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") for the limited purpose of allowing Lead Plaintiff to obtain documents from defendants already produced to the United States Securities and Exchange Commission ("SEC"), which used those documents to issue its recent Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies (the "Credit Agencies Report")[1] and states:

## I.    INTRODUCTION

Following the appointment of Boca Raton F&P Fund as lead plaintiff pursuant to the PSLRA, on May 7, 2008, it filed its Consolidated Class Action Complaint for Securities Fraud (the "Complaint") on behalf of all purchasers of the common stock of The McGraw-Hill Companies, Inc. ("McGraw-Hill" or the "Company") between July 25, 2006 and March 11, 2008, (the "Class Period").[2]

The Complaint alleges in great detail that Defendants, acting with scienter, made numerous false and misleading statements to investors concerning the Company's financial performance and ratings of risky subprime Residential Mortgage Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs") by its Standard & Poor's ("S&P") brand.  For example, as significant

---

[1] A true and correct copy of the Credit Agencies Report is attached hereto as **Exhibit A.**

[2] Defendants in this Action are McGraw-Hill, Harold McGraw III ("McGraw III"), and Robert J. Bahash ("Bahash") (McGraw-Hill, McGraw III, and Bahash are sometimes collectively referred to as "Defendants").  This case was originally filed in the United States Court for the District of Columbia.  On June 10, 2008, the Defendants filed their Consent Motion to Transfer Action to the Southern District of New York.  The District Court for the District of Columbia granted Defendants' motion on June 18, 2008.

problems in the RMBS and CDO market began to emerge, the Complaint alleges that McGraw-Hill promoted itself as a company both positioned and capable of addressing such problems with its ratings, ratings staff, and ratings models, as well as through active surveillance of the transactions its S&P brand rated.  In reality and contrary to McGraw-Hill's representations, however, the truth was that Defendants, in order to dupe investors and artificially inflate the price of the Company's stock, omitted critical, then-known material facts including, among other things, the Company's ongoing failure to monitor the RMBS and CDOs it rated.

Subsequent to the filing of the Complaint, the SEC issued its Credit Agencies Report partially revealing additional disturbing truths about three credit rating agencies in the United States, including McGraw-Hill's S&P brand.  These startling revelations, which shed additional light on the falsity of Defendants' Class Period statements, include:

- "One analyst expressed concern that her firm's model did not capture 'half' of the deal's risk, but that '*it could be structured by cows and we would rate it*.'"

- "In another email, an analytical manager in the same rating agency's CDO group wrote to a senior analytical manager that the rating agencies continue to create an 'even bigger monster - the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters. ;o"

- "***[N]ot all our criteria is published***.  [F]or example, we have no published criteria on hybrid deals, which doesn't mean that we have no criteria."

- "Rating agencies made 'out of model adjustments' and did not document the rationale for the adjustments" and one firm "did not publicly disclose the practice of overriding model outputs regarding loss expectations on subprime second liens."

- "None of the rating agencies examined had specific written procedures for rating RMBS and CDOs."

*See* Credit Agencies Report, **Exhibit A**, at 12-21.[3]

_____

[3] According to the *Wall Street Journal*, these are direct quotes from internal S&P e-mails.

There is no question that significant portions of the Credit Agencies Report resulted from information that came from McGraw-Hill and its S&P brand, including some e-mails and statements that have been directly attributed to S&P.  In a recent article, the *Wall Street Journal* reported that "[p]roblems keeping up with the surging growth of mortgage-related debt products were particularly acute at [S&P]. . ." and that "[s]ome of the most strongly worded e-mails from analysts questioning [the firms'] own ratings came from S&P. . . the largest bond-rating firm by revenue."  *See* **Exhibit B**, Aaron Lucchetti, *Behind the Ratings*, WALL. ST. J., Aug. 2, 2008, at B1.  The article revealed that in "one e-mail, an S&P analytical staffer e-mailed another that a mortgage or structured settlement deal was 'ridiculous' and that 'we should not be rating it.'"  *Id.*  "The unredacted version of the SEC's report also shows that S&P. . . didn't add staff dealing with CDOs as fast as that business was growing.  At S&P, revenue from rating the mortgage-laden bond portfolios grew more than 800% from 2002 to 2006, but relating staffing [only] doubled."  *Id.*

The "draft version of the SEC's report on credit-rating firms reveals [S&P's] questionable internal procedures, heavy workload and accommodations made for business reasons:"

- "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?" **-- Nov. 9, 2004 e-mail from a senior analytical manager at S&P to a senior business manager.**

- "Our staffing issues, of course, make it difficult to deliver the value that justifies our fees." **-- April 27, 2007, e-mail between two business managers at S&P.**

*See id.* (as set forth above, the *Wall Street Journal* attributed e-mails to S&P that referred to the CDO market as a "house of cards" and stated that the S&P's models could not capture "half" of the risk of the deals it rated).

In short, the Credit Agencies Report demonstrates both the material falsity of Defendants' Class Period statements and is powerful evidence that such false statements were made with scienter.

As set forth below, the Court should enter an Order modifying the PSLRA's discovery stay and instructing Defendants to produce all documents provided to the SEC.

## II.    BACKGROUND

As specifically alleged in Lead Plaintiff's Complaint, Defendants misrepresented and failed to disclose that the Company's S&P brand (which accounted for some 75% of McGraw-Hill's total operating income in 2007, up from 42% in 2000) was incapable of properly rating RMBS and CDOs, did not have sufficient rating criterion to do so, and misapplied or ignored the criteria it did have, thereby assigning excessively high ratings to bonds backed by risky subprime mortgages, including RMBS and CDOs. All of these factors, in combination, materially mislead investors concerning the Company's ability to rate these investments, which were extremely lucrative to McGraw-Hill and artificially inflated its true financial condition. Moreover, despite the dramatic downturn in the housing market and the rise in delinquencies of subprime mortgages, S&P maintained its excessively high ratings, rather than downgrade the bonds to reflect the true risk associated with RMBS and CDOs. The result was that Defendants mislead the market and artificially inflated the value of McGraw-Hill stock.

Then, on August 16, 2007, it was reported that the European Union would examine why credit agencies were slow to react to early signs of U.S. loan defaults. Upon this news, which was a partial revelation of the truth behind the Company's financial condition, shares of the Company's stock dropped from $50.74 per share on August 15, 2007 to a low of $47.76 on August 16, 2007, on extremely heavy trading of 7,391,300 shares, more than three times the stock's daily trading average. As more negative news trickled out, it was revealed in September 2007 that the SEC and State Attorneys General of New York, Massachusetts, Illinois, as well as the District of Columbia and Ohio were investigating S&P to examine how S&P evaluated subprime mortgage-backed securities

that grew into a trillion-dollar market, probe how S&P is paid, and analyze whether it is independent enough from the Wall Street firms that issue bonds.

While these investigations were ramping up, McGraw-Hill issued positive news to the market through a press release on September 18, 2007, entitled "The McGraw-Hill Companies Reaffirms Double-Digit Earnings Growth for 2007," which stated in relevant part:

> In a presentation today at Goldman Sachs' Communacopia XVI 2007 conference, Harold **McGraw III**, chairman, president and CEO of The McGraw-Hill Companies (NYSE: MHP), **reaffirmed that the Corporation expects to achieve double-digit earnings growth in 2007**, continuing its long-standing record of growth.
>
> "We expect to achieve our goal of double-digit earnings growth for the year even though the rate of growth is expected to slow during the second half of the year as compared to our very strong first-half performance," said Mr. McGraw. "For the full year, we also still expect to achieve double-digit top- and bottom-line growth in Financial Services, as well as improved operating margins in our McGraw-Hill Education and Financial Services business segments."

Thereafter, on October 10, 2007, the Connecticut Attorney General issued subpoenas to the three largest debt rating agencies, including S&P, as part of an antitrust investigation into the commercial debt rating industry. McGraw-Hill, however, did not disclose the subpoena until October 26, 2007.

Subsequently, in January 2008, McGraw-Hill terminated 600 employees, but touted a 2-4% growth in revenue in its Financial Services segment – to which analysts responded favorably. Then, on February 7, 2008, the Company issued a press release highlighting "reforms" that had been made to "strengthen" its rating operations. The response to the Company's reforms was negative, with the New York Attorney General calling them "window dressing" and "too little, too late" on February 7, 2008. Indeed, the day after the reforms were announced, the Company's stock price fell approximately 5.5%, dropping from a close of $43.01 on February 7, 2008 to a closing price of $40.66 on February 8, 2008.

- 5 -

A short while later, on February 29, 2008, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2007, and continued to tout growth for 2008. The financial results reported in the 10-K were substantially similar to those reported in the Company's January 24, 2008 press release. The Form 10-K was signed by the Individual Defendants, and contained required Sarbanes-Oxley certifications signed by the Individual Defendants stating that the Form 10-K did not include any material misrepresentations. Although the 10-K continued to highlight growth in the Company's lucrative Financial Services segment for 2008, it also provided some detail on the many investigations facing the Company. In discussing the Company's financial condition, the 2007 10-K revealed, in relevant part:

> *In the third quarter of 2007, rating agencies became subject to scrutiny for their ratings on structured finance transactions that involve the packaging of subprime residential mortgages, including residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").*
>
> *On August 29, 2007, Standard & Poor's received a subpoena from the New York Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages.* Standard & Poor's is responding to this request.
>
> *In September 2007, the SEC commenced an examination of rating agencies' policies and procedures regarding conflicts of interest and the application of those policies and procedures to ratings on RMBS and related CDOs.* Standard & Poor's is cooperating with the SEC staff in connection with this examination.
>
> *On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business.* The subpoena appears to relate to an investigation by the Connecticut Attorney General into whether [S&P], in the conduct of its credit ratings business, violated the Connecticut Antitrust Act. Subsequently, a second subpoena dated December 6, 2007, seeking information and documents relating to the rating of securities backed by residential real estate mortgages, and a third subpoena dated January 14, 2008, seeking information and documents relating to the rating of municipal and corporate debt, were served. The Company is responding to the subpoenas.
>
> *On November 8, 2007, Standard & Poor's received a civil investigative demand from the Massachusetts Attorney General's Office requesting information and*

- 6 -

> ***documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages. Standard & Poor's is responding to this request***.

On the final day of the Class Period, March 11, 2008, McGraw-Hill withdrew its recently issued financial forecasts for 2% to 4% full-year revenue growth in its Financial Services segment (responsible for rating lucrative RMBS and CDOs). Immediately after this additional partial revelation of its true financial condition, on enormous trading volume McGraw-Hill shares fell $0.69 or 1.8%, even as the Dow Jones Industrial Average surged 260 points (or nearly 3%), to close at $37.30, having earlier hit a new 52-week low of $36.32. This drop represented ***a 49% decline*** from its Class Period high.

After the close of the Class Period, more evidence of Defendants' fraud continued to leak out into the market. On June 5, 2008, the Office of the New York State Attorney General issued a press release (the "Press Release") announcing "Landmark Reform Agreements" with McGraw-Hill's S&P brand to, among other things, increase the transparency of the RMBS market.[4] As part of the settlement, S&P essentially admitted to the very actions that gave rise to the claims in this case and agreed to institute systemic reforms. The Press Release stated in relevant part:

> Attorney General Andrew M. Cuomo today announced that he has reached landmark agreements with the nation's three principal credit rating agencies that will ***fundamentally reform the Residential Mortgage-Backed Securities ("RMBS") market***. The agreements with Standard & Poor's ("S&P") Moody's Investors Service, Inc. ("Moody's"), and Fitch, Inc. ("Fitch") will dramatically increase the independence of the ratings agencies, ensure that crucial loan data is provided to the agencies before they rate loan pools, and increase transparency in the RMBS market.
>
> Under the agreements with Attorney General Cuomo, the credit rating agencies ***will fundamentally alter how they are compensated by investment banks*** for providing ratings on loan pools. In addition, the ratings firms will all now require ***for the first time that investment banks provide due diligence data on loan pools for review prior to the issuance of ratings***. This will ensure that significant data, ***which was***

---

[4] A true and correct copy of the Press Release is attached hereto as **Exhibit C**.

***not previously disclosed*** to the rating agencies, will be received and reviewed by them before any bonds are rated.

> ***"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities.*** The tremendous reach of this crisis cannot be understated – out entire economy continues to feel aftershocks from the collapse of the mortgage industry," said Attorney General Cuomo. "***By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of the collapse.***"

Then, in July of 2008, the SEC's ongoing investigation culminated with the release of the Credit Agencies Report. The Credit Agencies Report specifically identified the Company's S&P brand as one of the credit agencies that mislead the market regarding its ratings of the RMBS and CDOs. Addressing the three major credit reporting agencies, which include S&P, the SEC's Credit Agencies Report revealed:

- "***[C]ertain significant aspects of the ratings process and methodologies used to rate RMBS and CDOs were not always disclosed, or were not fully disclosed***." One criteria officer in the Structured Finance Surveillance Group remarked, "our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive. It might be too much of a stretch to say that we're complying with it because our SF [structured finance] rating approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive. Doing a complete inventory of our criteria and documenting all of the areas where it is out of date or inaccurate would appear to be a huge job – that would require far more man-hours than writing the principles-based articles."

- "***Rating agencies made 'out of model adjustments' and did not document the rationale for the adjustment***. In certain instances, the loss level that was returned by application of the rating agency's quantitative model was not used, and another loss level was used instead. ***These decisions to deviate from the model were approved by ratings committees but in many cases the rating agency did not have documentation explaining the rationale for the adjustments, making it difficult or impossible to identify the factors that led to the decision to deviate from the model.*** Two rating agencies frequently used "out of model" adjustments in issuing ratings . . . it appears that [one rating agency] did not publicly disclose that practice of overriding model outputs regarding loss expectations . . . ."

- 8 -

- *"**None of the rating agencies examined had specific written procedures for rating RMBS and CDOs**" and "**[r]atings agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies**."  (Emphasis in original.)

- Despite charging issuers upfront or annually for ratings surveillance fees, at least one agency lacked sufficient personnel and an internal email reflected a concern that surveillance criteria used during part of the review process were inadequate.[5]   Also, there was "poor documentation of the surveillance conducted" and "[t]wo rating agencies [did] not have internal written procedures documenting the steps that their surveillance staff should undertake to monitor RMBS and CDOs."

- An email from the Senior Analytical Manager of RMBS Surveillance noted "[h]e asked me to begin discussing taking rating actions earlier on the poor performing deals.  I have been thinking about this for much of the night.  We do not have the resources to support what we are doing now. . . . I am seeing evidence that I really need to add to the staff to keep up with what is going on with sub prime and mortgage performance in general, NOW."

- The report concluded that at least two of the rating agencies struggled to adapt to the increase in the volume and complexity of the deals they rated, and that "[t]here are indications that ratings were issued notwithstanding that one or more issues raised during the analysis of the deal remained unresolved."  For example, documents in a deal file regarding an issue with a collateral manager state "We didn't ha [sic] time to discuss this in detail at the committee, so they dropped the issue for this deal due to timing.  We will need to revisit in the future."  Another document described an outstanding issue as "poorly addressed – needs to be checked in the next deal" and addresses the question of weighted average recovery rate by writing "(WARR – don't ask ☺)."

*See* Credit Agencies Report, **Exhibit A**, at 12-21.

---

[5] The internal email stated:  "I think the history has been to only review a deal under new assumptions/criteria when the deal is flagged for some performance reason.  I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria.  The two major reasons why we have taken the approach is (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook [sic] at an existing deal with the new assumptions (i.e., no cash flow models for a number of assets)."

Significantly, rating agencies like S&P, whose misrepresentations were revealed instantaneously, agreed to an informal settlement with the SEC to engage in remedial actions to correct the wrongs identified in the Credit Agencies Report. These remedial actions for S&P – which are essentially admissions of the falsity of Defendants' Class Period statements, as well as their scienter – include:

- Evaluating, both at the present time and on a periodic basis, whether it has sufficient staff and resources to manage its volume of business and meet its obligations under the Exchange Act;

- *Conducting a review of its current disclosures* relating to processes and methodologies for rating RMBS and CDOs *to assess whether it is fully disclosing its ratings methodologies* in compliance with the Exchange Act;

- Reviewing whether its policies governing the timing of disclosure of a significant change to a process or methodology are reasonably designed to comply with these requirements;

- *Conducting a review to determine whether its written policies and procedures* used to determine credit ratings for RMBS and CDOs *are fully documented*;

- Conducting a review of its current policies and practices for documenting the credit ratings process and the identities of RMBS and CDO ratings analysts and committee members to review whether they are reasonably designed to ensure compliance with Rule 17g-2 and to address weaknesses in the policies or in adherence to existing policies that result in *gaps in documentation of significant steps and participants in the credit ratings process*;

- Conducting a review to *determine if adequate resources are devoted to surveillance of outstanding RMBS and CDO ratings*. This review will include, for example, whether the rating agency maintains adequate staffing and has adequate expertise dedicated to performing ongoing surveillance. The Company will also ensure that it has comprehensive written surveillance procedures and all appropriate surveillance records shall be maintained;

- Reviewing its practices, policies and procedures for mitigating and managing the "issuer pays" conflict of interest.

*See* Credit Agencies Report, **Exhibit A**, at 12-27. The remedial actions listed in the Credit Agencies Report are directly relevant to the claims specifically alleged in Lead Plaintiff's Complaint, and are, in fact, evidence in support of those claims.

- 10 -

As a result of the revelations of such egregious conduct and proposed solutions, all of which are clearly facts that support Lead Plaintiff's claims and demonstrate both falsity and scienter, Lead Plaintiff seeks partial relief from the PSLRA discovery stay for the limited purpose of obtaining documents already produced by Defendants to the SEC.  Without the relief requested herein, which would neither prejudice nor burden McGraw-Hill (and would not violate the spirit and purpose behind the PSLRA discovery stay), Lead Plaintiff will be deprived of a rich source of evidence in support of the Complaint's existing allegations and would be severely prejudiced as a result. Accordingly, Lead Plaintiff requests that the Court grant this motion, modify the PSLRA discovery stay in this action, and permit Lead Plaintiff to seek the requested documents.

## III.    ARGUMENT

### A.    Courts Have Explicit Authority to Modify the PSLRA's Discovery Stay

The PSLRA provides that discovery in a securities fraud class action is stayed while a motion to dismiss is pending:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, *unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.*

15 U.S.C. §78u-4(b)(3)(B).[6]  The legislative history of the PSLRA indicates that Congress enacted the discovery stay to prevent plaintiffs from filing securities class actions with the intent of using the discovery process to force a coercive settlement.  *See* H. Rept. No. 104-369 (Nov. 28, 1995). Thus, the PSLRA explicitly provides courts with discretion to allow discovery to go forward prior to a judicial determination of the sufficiency of a plaintiff's complaint.  *See In re  Delphi Corp. Sec., Derivative & "ERISA" Litig.*, No. 05-MD-1725, 2007 U.S. Dist. LEXIS 10408, at *13 (E.D. Mich.

---

[6] Unless stated otherwise herein, internal quotations and citations are omitted and all emphasis is added.

Feb. 15, 2007)  (noting that if Congress had intended an absolute stay on discovery, it would not have authorized a judicial reprieve).

### B.    Courts Routinely Modify the Discovery Stay under Similar Circumstances

Courts have not hesitated to modify the discovery stay in other securities class actions involving concurrent investigations by governmental agencies when doing so would not frustrate the purposes of the PSLRA.  *See, e.g.*, *Seippel v. Sidley, Austin, Brown & Wood LLP*, No. 03 Civ. 6942 (SAS), 2005 U.S. Dist. LEXIS 2388, *4-*6 (S.D.N.Y. Feb. 17, 2005) (modifying stay as to documents already produced to the government, on ground that cost of such discovery to defendants is minimal because the documents have already been compiled for production, while plaintiffs would suffer severe prejudice if discovery is delayed while government investigations and other lawsuits proceed ahead of them); *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374 (JWB) 2005 U.S. Dist. LEXIS 37962, at *4 (D.N.J. Feb. 15, 2005) (lifting PSLRA discovery stay and ordering production of all documents produced by defendants to various government agencies, such as SEC, and/or any other regulatory, legislative or governmental entity both inside and outside the United States); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio Jan. 26, 2004) (lifting discovery stay to permit lead plaintiffs to obtain documents already produced by First Energy to government entities); *Singer v. Nicor, Inc.,* No. 02C5168,  2003 U.S. Dist. LEXIS 26189, at *2 (N.D. Ill. Apr. 23, 2003) (lifting discovery stay because plaintiffs would be unfairly disadvantaged if they did not have access to documents previously provided to SEC, Illinois Attorney General, and other government agencies); *In re Enron Sec. Derivative & "ERISA" Litig.*, No. MDL 1446, H-01-3624, 2002 U.S. Dist. LEXIS 26261, at *1 (S.D. Tex. Aug. 16, 2002) (lifting stay as to materials already made available to numerous government agencies and others); *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (citing H.R. Conf. Rep. No. 104-369, at 37 (1995)

and S. Rep. No. 104-98, at 14 (1995)); *see also Vacold LL & Immunotherapy, Inc. v. Cerami*, No. 00Civ.4024 (AGS), 2001 WL 167704, at *7 (S.D.N.Y. Feb. 16, 2001) (modifying discovery stay where request "does not implicate a concern that plaintiffs are seeking discovery to coerce a settlement or to support a claim not alleged in the Complaint.").

For the reasons set forth below, Lead Plaintiff's particularized, limited discovery requests to Defendants fall squarely within the Congressionally-created exceptions to the PSLRA discovery stay. Moreover, this action is a far cry from the "frivolous" actions that caught Congress' attention. Lead Plaintiff's existing Complaint is highly-particularized and is supported by documentary evidence and the accounts of many well-placed confidential witnesses. Lead Plaintiff does not seek discovery in the hopes of finding "some sustainable claim not alleged in the complaint" or as leverage to coerce defendants into settling meritless claims rather than bear the high costs of discovery. *See In re Delphi*, 2007 U.S. Dist. LEXIS 10408 at *12-*13 (granting lead plaintiffs' request for a partial modification of discovery stay). To the contrary, the SEC's conclusions, the direct attribution by the *Wall Street Journal* of internal S&P e-mails quoted in the Credit Agencies Report, and McGraw-Hill's subsequent admissions through a "settlement" to change its business practices are direct evidence in support of Lead Plaintiff's claims.

Moreover, Lead Plaintiff is not casting a broad discovery net in the hopes of catching evidence upon which to base new allegations. To the contrary, Lead Plaintiff knows exactly what its claims are and only seeks limited discovery (*i.e.*, the documents that demonstrate the SEC's conclusions) from Defendants to prevent undue prejudice. For the reasons explained below, the Court should grant this Motion and permit Lead Plaintiff to engage in this limited discovery from Defendants.

### C.    Plaintiff's Proposed Discovery Is "Particularized"

The first requirement to lifting the PSLRA discovery stay is a request for "particularized discovery." 15 U.S.C. §78u-4(b)(3)(B). This requirement is fulfilled when the discovery requested satisfies a two-prong test: first, the request should be "directed at specific persons" and second, the request must "identif[y] specific types of evidence that fall within its scope." *In re Tyco Int'l, Ltd. Sec. Litig.*, No. MDL00-MD-1335-B, 2000 U.S. Dist. LEXIS 11659, at *12 (D.N.H. Jan. 29, 2003) (analyzing requirement in context of preservation of subpoenas to third parties). Here, Lead Plaintiff's request satisfies both prongs. Lead Plaintiff merely requests that Defendants produce the closed universe of precisely the same documents and information they provided to the SEC, who in turn, relied upon those documents in the compilation of the Credit Agencies Report. Lead Plaintiff is not requesting that Defendants produce documents that do not relate to the Complaint's existing allegations, or documents that have not already been gathered, vetted, and produced to the SEC.[7] Thus, Lead Plaintiff satisfies the "particularized discovery" requirement. *See In re Delphi*, 2007 U.S. Dist. LEXIS 10408, at *14-*18 (finding requests were particularized where they sought closed universe of materials Delphi already assembled and produced to the investigators and federal authorities).

### D.    Plaintiff Will Be Unduly Prejudiced Without Modification of the PSLRA Stay

The second requirement to lifting the PSLRA discovery stay is that the discovery "is necessary to prevent undue prejudice to that party." 15 U.S.C. §78u-4(b)(3)(B). This requirement is best interpreted "in light of Congress's purposes in passing the PSLRA" because the term, "undue

---

[7] To the extent the Defendants claim that any documents produced to the SEC are confidential, Plaintiff is willing, ready and able to enter into an appropriate confidentiality stipulation.

prejudice," is not defined in 15 U.S.C. §78u-4(b)(3)(B).  *In re  Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 247 (D. Md. 2004); *In re Williams Sec. Litig.*, No. 02-CV-72H (M), 2003 U.S. Dist. LEXIS 24304, at *15 (N.D. Okla. May 22, 2003). Congress specifically left the issue of whether prejudice is "undue" to the courts to resolve because "the Court must consider all the facts and circumstances presented by each particular case." *In re Williams*, 2003 U.S. Dist. LEXIS 24304, at *14-*15.   Plaintiffs need not show irreparable harm to prove undue prejudice, but rather "improper or unfair treatment" under the circumstances.  *In re Delphi,* 2007 U.S. Dist. LEXIS 10408, at *20.

A discovery stay may be lifted where access to documents is essential for a party to make informed decisions. *In re AOL Time Warner, Inc. Sec. Litig*., No. MDL1500 (SWK), 06Civ.0695 (SWK), 2006 WL 1997704, at *2 (S.D.N.Y. July 13, 2006) (granting defendant's motion to lift discovery stay finding undue prejudice where plaintiffs had access to documents already produced by defendant in another case).  For example, in *In re FirstEnergy* the court found that the plaintiffs in the securities class action would be unduly prejudiced without access to documents already made available to governmental entities because the securities plaintiffs would not be in a position to pursue informed litigation and settlement strategies.  *In re FirstEnergy*, 229 F.R.D. at 545; *accord Singer*, 2003 U.S. Dist. LEXIS 26189, at *5 ("Plaintiffs here may well be unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have during the pendency of the motion to dismiss."); s*ee also WorldCom*, 234 F. Supp. 2d at 305 (holding documents produced to certain governmental entities must also be produced to plaintiff in securities action "in order to prevent undue prejudice to the interests of the putative investor class" because without those documents,  plaintiff "would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape," and "would essentially be the

only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings.").

Here, the prejudice to Lead Plaintiff is just as severe as in the cases where the courts have lifted the stay. McGraw-Hill has repeatedly represented to investors that it acted with complete transparency in rating RMBS and CDOs. Notwithstanding these representations, McGraw-Hill already has produced documents and other information to the SEC and several states' attorney general offices demonstrating that its Class Period statements were false and misleading. Further, McGraw-Hill has agreed to settle claims by the SEC and the New York Attorney General by reforming many of its business practices. If the stay remains in place, Lead Plaintiff will be without access to this already-produced information and will be unduly prejudiced by its inability to make informed decisions about its litigation strategy in this rapidly shifting landscape.

Moreover, the basis for partially modifying the stay in this case is particularly compelling because the facts and conclusions set forth in the Credit Agencies Report (many of which have been directly attributed to S&P by the *Wall Street Journal*) are far beyond typical fact discovery. Rather than being simply relevant or merely reasonably calculated to lead to the discovery of admissible evidence, the information contained in the Credit Agencies Report and the documents that support the conclusions therein, are direct scienter and falsity facts and offer further support that the pleading requirements of the PSLRA have been satisfied. Thus, the automatic stay should be modified to the extent necessary to place Lead Plaintiff on a level playing field, so as to prevent the type of "undue prejudice" that the PSLRA specifically gave this Court the discretion to prevent.

### E.    Modification of the PSLRA Discovery Stay Will Not Impose an Undue Burden on Defendants

"[I]t is customary to consider whether a production request places an undue burden on the party from which it is requested." *In re WorldCom*, 234 F. Supp. 2d at 306. Here, Lead Plaintiff

seeks nothing more than access to the very same information that has already been produced to the SEC. Accordingly, as the costs and expenses associated with such a production of this closed universe of documents have already been incurred and absorbed by Defendants, complying with this request will place only the slightest additional burden upon Defendants.

In the *FirstEnergy* securities litigation, the court noted that the defendants could not allege any burden from producing the requested information because the defendants already reviewed, compiled and produced the requested information to the government. *FirstEnergy*, 229 F.R.D. at 545. The court further noted that there was no risk that plaintiffs were using discovery as a fishing expedition because, as here, the complaint alleged facts to independently support the claims. *Id.*

Similarly, in *Singer,* the court noted that "since these documents have already been found and compiled and plaintiffs will pay production costs, defendants will not be unduly burdened by producing them to plaintiffs now." *Singer*, 2003 U.S. Dist. LEXIS 26189, at *2. As in *Singer*, Lead Plaintiff here is willing to pay the reasonable production costs for the closed universe of materials already produced to the SEC.

Likewise, in *WorldCom*, the court found that "[n]either rationale underlying the PSLRA's discovery stay provision [was] contravened by plaintiffs' application," because the plaintiffs "clearly [had] not filed the complaint to initiate a 'fishing expedition' in search of sustainable claims or to force defendants to settle an otherwise frivolous class action." *WorldCom*, 234 F. Supp. 2d at 305. Therefore, the court concluded:

> Where, as here, plaintiffs are not in any sense engaged in a fishing expedition or an abusive strike suit and do not thereby act in contravention of the fundamental rationales underlying the PSLRA discovery stay . . . defendants cannot call upon the ambiguous notion of "particularized" discovery to bend Section 78u-4(b)(3)(B) to a purpose for which it was not intended.

*Id*. at 306.

In *Enron*, the court granted a similar request to modify the automatic stay of discovery, permitting the plaintiffs to obtain discovery from Enron of certain documents that had already been, or would be, made available to and reviewed by the government and others.  The court explained that the PSLRA's discovery stay "was designed to prevent fishing expeditions in frivolous securities lawsuits," and "was not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case." *Enron*, 2002 U.S. Dist. LEXIS 26261, at *30.

The *Enron* court again modified the discovery stay several months later to permit the plaintiffs in the securities fraud action to receive additional documents that *Enron* had produced in response to inquiries or investigations by Congress, legislative branch committees, and the executive branch (including the SEC and the Department of Justice), as well as transcripts of witness interviews and depositions related to those inquiries.  *See id.*, at *29-*32.  The court rejected the defendants' argument that the PSLRA prohibited such discovery, and directed the materials be produced to the lead plaintiff because "[i]n a sense this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse."  *Id*. at *32.  The court found the PSLRA discovery stay was designed to protect defendants from unnecessary discovery costs, but the burden was slight because *Enron* had already found, reviewed, and organized the documents.  *Id*.

In ordering the production of SEC and New York Stock Exchange documents, this Court in *LaBranche* stated that when it is clear that plaintiffs are not seeking to use the discovery in order to "force a coercive settlement or to find a claim not alleged in the complaint," then access to these type of documents "is essential to determine that [litigation] strategy and to assist in formulating an appropriate settlement demand." *In re LaBranche Sec. Litig.,* 333 F. Supp. 2d 178, 183-84 (S.D.N.Y.

2004). This Court added that "Lead Plaintiffs will suffer undue prejudice in having to defer such decisions. The defendants have not demonstrated any burden imposed by complying now with the inevitable discovery." *Id.* at 184.

Here, as in each of the cases discussed above, Lead Plaintiff seeks to obtain information already collected and provided to other parties. In particular, Lead Plaintiff only seeks the following documents:

> All documents produced to the SEC in connection with the investigation that culminated in the publication of the Credit Agencies Report, together with transcripts of any interview conducted by the SEC in the course of such investigation.

This is an even narrower category of documents than the court permitted the securities litigation plaintiffs in *Enron* to have on the ground that "discovery already has been made." Similarly, here, modifying the automatic stay to permit this discovery would not impose any burden (let alone an undue burden) on Defendants because the information already has been collected for the purposes of responding to the SEC's investigation that lead to publication of the Credit Agencies Report.

Moreover, Defendants cannot make a good faith argument that this is a strike suit aimed at coercing a settlement. Nor can Lead Plaintiff's request be reasonably characterized as a "fishing expedition" to find evidence in support of claims not yet alleged. Accordingly, Lead Plaintiff requests that the Court modify the discovery stay and allow Lead Plaintiff access to the requested documents and information.

## IV.    CONCLUSION

Based on the foregoing reasons, Plaintiff's Motion to Partially Modify the PSLRA Discovery Stay should be granted in its entirety.

**WHEREFORE**, Lead Plaintiff respectfully requests that the Court enter an Order granting Lead Plaintiff's Motion to Partially Modify the PSLRA Discovery Stay, and such other and further relief as the Court deems just and proper.

DATED:  September 10, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP

                    */s/ David J. George*
                    DAVID J. GEORGE

DAVID J. GEORGE, *admitted pro hac vice*
ROBERT J. ROBBINS, *admitted pro hac vice*
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Telephone:  561/750-3000
561/750-3364 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DAVID J. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2008, I caused a true and correct copy of the foregoing document to be served: electronically using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document *via* the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ David J. George*
DAVID J. GEORGE