UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CLAUDE A. REESE, Individually and on
Behalf of All Others Similarly Situated

                                Plaintiff,

    vs.

THE MCGRAW-HILL COMPANIES, INC.,
et al.,

                              Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:08-cv-7202-SHS

<u>CLASS ACTION</u>

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR
RELIEF FROM JUDGMENT UNDER RULE
60(b) AND FOR LEAVE TO AMEND
COMPLAINT UNDER RULES 15(a)
AND (d)

825162_1
825162_1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  ARGUMENT ......................................................................................................5

    A.   Legal Standard ........................................................................................5

    B.   New Facts Demonstrate the Falsity and Scienter of Defendants'
        Statements Regarding the Integrity of S&P's Ratings, and Establish Those
        Statements to Be Much More than Puffery.............................................6

        1.   New Facts: S&P's Slowdown in Rolling Out Its New Ratings
            Model (E3) and Its Creation of "E3 Low" for Deals that Could Not
            Pass E3 .......................................................................................9

        2.   New Facts: July 2007 Internal E-mail Discussing Deals that Would
            Be Rated and Require Immediate Downgrade.........................................10

        3.   New Facts: S&P's "Notching" Policy – and S&P's Decision to
            Disregard It .................................................................................11

        4.   Previously Unavailable Facts: Jordan's and Gillis' Focus on
            Market Share over Ratings Accuracy ........................................13

        5.   Previously Unavailable Facts: McGraw's Focus on Profits, Not
            Accuracy of Ratings.....................................................................14

    C.   New Facts Demonstrate Both the Falsity and Scienter of Defendants'
        Statements Regarding S&P's Ongoing Surveillance of Its Ratings .....................14

        1.   New Facts: Jordan's July 6, 2007 E-mail Describing "Firewall"
            Blocking Information Between RMBS Ratings and CDOs
            Impacted by Those RMBSs ...................................................16

        2.   New Facts: Content of March 19, 2007 Presentation to McGraw,
            Including Details Regarding Increased Downgrading Activity on
            Subprime RMBSs, but No Adjustment to CDOs Incorporating
            Those RMBSs .............................................................................16

        3.   New Facts: Internal Report, Entitled "RMBS & CDO Surveillance
            Weekly Subprime Update," Including Facts Such as Actual RMBS
            Default Rates of 35%-56.27%, When S&P Continued to Use
            Assumption of 3% RMBS Default Rate to Rate CDOs............................18

**Page**

       4.     New Facts: Executive F Regularly Told Colleagues She Was Prevented by Gillis and Other S&P Executives from Downgrading Subprime RMBSs Because of Market Share Concerns ............................19

  D.    Plaintiff Diligently Investigated the Available Facts in Drafting the Second Amended Complaint, but Did Not Have Access to or Could Not Use the Compelling Facts Now Presented ............................................................20

III.    CONCLUSION ................................................................................................................21

825162_1

# TABLE OF AUTHORITIES

Page

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
No. 1:08-cv-07508-SAS-DCF (S.D.N.Y.) ...................................................................... *passim*

*Acito v. IMCERA Grp.*,
47 F.3d 47 (2d Cir. 1995) ........................................................................4, 15, 20

*Foman v. Davis*,
371 U.S. 178 (1962) .................................................................................5, 21

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11 Civ. 4209 (KBF), Opinion & Order (S.D.N.Y. Mar. 27, 2013) ...................................8

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................8, 14

*Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*,
609 F.3d 122 (2d Cir. 2010) ...........................................................................5

*Kotlicky v. U.S. Fid. & Guar. Co.*,
817 F.2d 6 (2d Cir. 1987) ..........................................................................5, 6, 21

*Kurzweil v. Philip Morris Cos.*,
No. 94 Civ. 2373 (MBM), 1997 U.S. Dist. LEXIS 4451 (S.D.N.Y. Apr. 9, 1997) ..................6

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................8, 14

*Miller v. Lazard, Ltd.*,
473 F. Supp. 2d 571 (S.D.N.Y. 2007) .................................................................15, 20

*Olsen v. Pratt & Whitney Aircraft*,
136 F.3d 273 (2d Cir. 1998) .........................................................................15, 20

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ..........................................................................8, 14

*Reese v. McGraw-Hill Cos.*,
08 Civ. 7202 (SHS), 2012 U.S. Dist. LEXIS 83753 (S.D.N.Y. Mar. 30, 2012), *aff'd*,
*Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12-1776-cv, 2012
U.S. App. LEXIS 25989 (2d Cir. Dec. 20, 2012) ........................................................2, 7, 15

- iii -

Page

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)................................................................8, 14

*United States v. McGraw-Hill Cos., Inc., et al.*,
    No. CV13-00779 (C.D. Cal.) ................................................................................1

*Universal Film Exchanges, Inc. v. Lust*,
    479 F.2d 573 (4th Cir. 1973) ................................................................................5

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)................................................................................................................8

Federal Rules of Civil Procedure
    Rule 9(b) ..........................................................................................................4, 15
    Rule 15(a), (d)................................................................................................1, 5, 21
    Rule 59(b) ..........................................................................................................5
    Rule 60(b) ................................................................................................ *passim*
    Rule 60(b)(2)................................................................................................5, 21

825162_1

Lead plaintiff Boca Raton Firefighters and Police Pension Fund ("plaintiff") respectfully submits this memorandum of law in support of its motion for an order relieving it of the final judgment in this action under Fed. R. Civ. P. 60(b), and permitting it to file its [Proposed] Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "[Proposed] Third Amended Complaint") under Fed. R. Civ. P. 15(a) and (d).  The [Proposed] Third Amended Complaint is attached as Exhibit 1 to the Declaration of David J. George in Support of Motion for Relief from Judgment Under Rule 60(b) and for Leave to Amend Complaint Under Rules 15(a) and (d) ("George Declaration"), submitted herewith and incorporated by reference.

## I.    INTRODUCTION

On February 4, 2013, the United States of America filed an historic lawsuit against The McGraw-Hill Companies, Inc. – the corporate defendant in this action – and Standard & Poor's Financial Services LLC ("S&P"): *United States v. McGraw-Hill Cos., Inc., et al.*, No. CV13-00779 (C.D. Cal.) (the "DOJ Action").[1]  Asserting claims of mail fraud, wire fraud, and financial institution fraud under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the United States is seeking to recover at least ***$5 billion*** in damages on behalf of various federally insured financial institutions.  *See* DOJ complaint, ¶275 (alleging losses "in excess of $5 billion").  The DOJ Action represents the first significant federal action against the ratings industry, which reaped record profits before the financial crisis began in 2008.

Importantly, the government's claims arise from S&P's fraudulent rating of residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") – the very types

---

[1]    The Complaint for Civil Money Penalties and Demand for Jury Trial (the "DOJ complaint") filed on February 4, 2013 by the U.S. Department of Justice ("DOJ") is attached to the George Declaration as Exhibit 2.

of securities at issue in this action.  According to the DOJ complaint: "[B]eginning at the latest in or about September 2004 and continuing through at least in or about October 2007" – a period that includes most of the proposed class period in this case (October 21, 2004 through March 11, 2008) –

> S&P, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud investors in RMBS and CDO tranches, . . . as to material matters, and to obtain money from these investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

DOJ complaint, ¶7.  The 286-paragraph DOJ complaint goes on to allege, in great detail, a fraud that U.S. Attorney General Eric Holder has characterized, in a press release issued by the DOJ on February 5, 2013, as "egregious – and it goes to the very heart of the recent financial crisis."  George Declaration Ex. 3.

This action on behalf of investors remains critical despite the government's parallel effort.  The government's suit, if successful, will censure defendants'[2] conduct and expose defendants to monetary fines, but provide no justice for investors who relied on defendants' materially false statements and were financially decimated as a result.

In dismissing this action on March 30, 2012, the Court concluded that plaintiff's allegations regarding the quality and integrity of S&P's ratings were mere "commercial puffery," that its allegations regarding S&P's ratings surveillance were insufficiently particular, and that plaintiff had failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.[3]  *See Reese v. McGraw-Hill Cos.*, 08 Civ. 7202 (SHS), 2012 U.S. Dist. LEXIS 83753 (S.D.N.Y. Mar. 30, 2012), *aff'd*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12-

---

[2]      "Defendants" refers to McGraw Hill, Harold "Terry" McGraw, III, and Robert J. Bahash.

[3]      The Court also dismissed plaintiff's claims based on McGraw-Hill's financial statements.  The Proposed Third Amended Complaint omits those claims.

- 2 -

1776-cv, 2012 U.S. App. LEXIS 25989 (2d Cir. Dec. 20, 2012).  With the filing of the DOJ complaint, however, plaintiff now has access to a wealth of detail that was unavailable to it when it filed its Second Amended Consolidated Class Action Complaint for Securities Fraud (Dkt. No. 37) (the "Second Amended Complaint").  Moreover, while this case was on appeal to the Second Circuit, the district court in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 1:08-cv-07508-SAS-DCF (S.D.N.Y.) unsealed deposition testimony containing facts previously unavailable to plaintiff and its counsel in this action that also strongly support plaintiff's claims.  *See* George Declaration, ¶3.[4]

As discussed further below and in the George Declaration, the newly available facts from the DOJ complaint and the *Abu Dhabi* discovery cure all the deficiencies perceived by the Court in dismissing the Second Amended Complaint.  Those facts demonstrate the falsity – and materiality – of defendants' statements regarding the integrity of S&P's ratings, as well as defendants' knowledge or extreme recklessness regarding that falsity.  For example, plaintiff can now allege S&P's willful decision to slow down the rollout of a new ratings model, called E3, specifically because its implementation would have led to a loss of business opportunities.  George Declaration, ¶12.  S&P went so far as to develop an alternative, watered-down version of E3, called E3 Low, to make it easier for a CDO issuer to achieve a higher CDO rating.  *Id.*, ¶13.  According to the DOJ complaint, the purpose of E3 Low was to "preserve[e] S&P's market share" (DOJ complaint, ¶181), and S&P

---

[4]     Before June 22, 2012, the *Abu Dhabi* deposition testimony was subject to a protective order stating that it "shall be used only for the purposes of prosecuting or defending the [*Abu Dhabi*] action."  George Declaration, ¶3.  The documents containing the testimony were publicly filed on July 2, 2012.  *Id.*  The relevant excerpts of testimony are attached to the George Declaration as Exhibits 4-6.

instructed its analysts, "*If the transaction fails E3, then use E3Low*." *Id.*, ¶184.[5]  These and other

new facts, heretofore unavailable to plaintiff, establish defendants' actual knowledge of the falsity of

their representations regarding the integrity of S&P's ratings, and establish those representations to

be much more than mere puffery.

Similarly, plaintiff can now allege far greater particularity concerning the falsity of

defendants' statements regarding S&P's ongoing surveillance of its ratings, as well as defendants'

knowledge or extreme recklessness regarding that falsity.  For example, contrary to defendants'

public representation that S&P had a "fully integrated surveillance process" between RMBS and

CDO surveillance, the new facts establish, in the words of Global CDO Managing Director Patrice

Jordan, that "currently all of this" – RMBS surveillance and CDO surveillance – "is firewalled and

highly confidential."  George Declaration, ¶46 (quoting July 6, 2007 e-mail).  Indeed, according to

the DOJ complaint, defendant McGraw and other McGraw-Hill executives learned during a March

19, 2007 presentation that the RMBS Credit Watch placements and downgrades undertaken to that

point in 2007 had not resulted in *any* downgrades of Credit Watch placements on S&P's CDO

ratings – even though a number of CDOs incorporated the very RMBS in question.  *Id.*, ¶39.  As

discussed below and in the George Declaration, there are many such new facts that justify the relief

sought by this motion, which is especially appropriate given the Second Circuit's holding that

"[l]eave to amend should be freely granted, especially where dismissal of the complaint was based

on Rule 9(b)." *Acito v. IMCERA Grp.*, 47 F.3d 47, 55 (2d Cir. 1995).

Given the gravity of the allegations in the DOJ complaint, and the extent and nature of the

new facts apparent therein, as well as in the recently unsealed discovery in *Abu Dhabi*, justice for

---

[5]     Internal citations are omitted and emphasis is added throughout unless otherwise noted.

plaintiff and the proposed class demands that they be relieved from the judgment in this action under Fed. R. Civ. P. 60(b), and be granted leave under Fed. R. Civ. P. 15(a) and (d) to file the [Proposed] Third Amended Complaint.  As demonstrated herein, the newly discovered and newly available facts are extremely compelling, and plaintiff's counsel has shown good cause for not having discovered or used them earlier.  Therefore, plaintiff respectfully requests that the Court grant the relief requested. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").[6]

## II.    ARGUMENT

### A.    Legal Standard

Fed. R. Civ. P. 60(b)(2) allows for relief from final judgment "when a movant presents 'newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).'" *Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 130-31 (2d Cir. 2010) (affirming grant of 60(b)(2) motion), quoting Fed. R. Civ. P.60(b)(2).

"[T]he policy in favor of hearing appellant's claims on the merits is preeminent." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987), citing *Universal Film Exchanges, Inc. v. Lust*, 479 F.2d 573, 576 (4th Cir. 1973) (resolve doubts in favor of granting motion to set aside the judgment).  "In deciding a Rule 60(b) motion, a court must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality."  *Kotlicky*, 817 F.2d at 9 (reversing denial of 60(b) motion).  "Generally, courts require that the evidence in support of the

---

[6]      Plaintiff incorporates the allegations of the [Proposed] Third Amended Complaint into this motion as an indication of how this case can now be pled.

motion to vacate a final judgment be 'highly convincing,' that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties."  *Id.*

A court in this district has granted a Rule 60(b) motion where newly discovered "reports and memoranda discussing the addictiveness of nicotine, and evidence that was not described in the initial complaint concerning the manipulation of nicotine levels" undermined the court's prior ruling that "defendants' statements [regarding addictiveness of nicotine and manipulations of nicotine levels] were permissible expressions of opinion reasonably supported by the evidence so as to justify dismissal."  *Kurzweil v. Philip Morris Cos.*, No. 94 Civ. 2373 (MBM), 1997 U.S. Dist. LEXIS 4451, at *23 (S.D.N.Y. Apr. 9, 1997).

Indeed, the *Kurzweil* court granted Rule 60(b) relief even though "the evidence could have been discovered shortly before the [original dismissal] order was issued" because (1) plaintiff "demonstrated due diligence," (2) the new evidence "likely could not have been presented before the order was entered" because it had to be culled from great volumes of related information, and (3) the new evidence was of "enough potential importance" that it likely would have precluded the original dismissal.  *Id.* at *15-*16.  With respect to scienter, *Kurzweil* held, "when the issue relates to what [defendants] knew or believed about its product, more of the same" – in other words, evidence that the defendants attempted to dismiss as merely duplicative – "may be different."  *Id.* at *25.

### B.    New Facts Demonstrate the Falsity and Scienter of Defendants' Statements Regarding the Integrity of S&P's Ratings, and Establish Those Statements to Be Much More than Puffery

The Second Amended Complaint alleges that defendants repeatedly represented the integrity of S&P's ratings, stating that those ratings accurately reflected the credit quality of the security being rated, regardless of any negative commercial ramifications for S&P itself.  On July 24, 2007, for example, on an investor conference call that included defendants McGraw and Bahash, Executive

Vice President Vickie Tillman told investors that "[t]ightening criteria may have an adverse impact on our market share, but we will continue to develop and adjust our criteria to reflect how changing conditions impact credit risk."  Second Amended Complaint, ¶349; *see also* ¶351.  She explained that increasing the stringency of ratings "can in fact have an adverse impact on whether [investment banks] come to Standard & Poor's or not, but that's not what we're concerned about.  We're concerned about calling it as it is."  *Id.*

Similarly, on September 18, 2007, McGraw publicly reiterated that S&P's ratings process applied "predetermined, nonnegotiable and publicly available criteria and assumptions to the facts presented."  *Id.*, ¶362.  According to McGraw, "while there may be more dialog between S&P and an issuer in the structured finance transaction, that does not change the reality that at its core, S&P is still just applying its own predetermined, nonnegotiable, publicly available criteria in a factual context."  *Id.*  At the same conference, McGraw also assured the market about the "independence" and "integrity" of S&P's "ratings opinions."  *Id.*  McGraw said that S&P had "institutional safeguards in place to ensure the independence and integrity of those opinions."  *Id.*

In dismissing plaintiff's claims based on these and similar allegations, the Court held that defendants' statements about the integrity of S&P's ratings were "mere commercial puffery."  *Reese*, 2012 U.S. Dist. LEXIS 83753, at*3.  The Second Circuit affirmed, holding, however, that the "'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue," distinguishing "matters of objective fact" from "misstatements regarding opinion."  *Boca Raton*, 2012 U.S. App. LEXIS 25989, at*13.

As discussed below (and in the George Declaration), newly discovered and newly available facts, alleged in the DOJ complaint and filed in the *Abu Dhabi* litigation, demonstrate that defendants' unequivocal statements concerning the integrity of their ratings were both objectively

- 7 -

verifiable (not puffery), verifiably false, and known by defendants to be false. These facts establish that defendants secretly lowered ratings, internally adjusted rating standards to achieve the desired results, and refused to use available data that would yield more accurate ratings but jeopardize market share.

In such circumstances, representations of integrity are not mere vague opinions constituting puffery, but actionable statements of fact. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (when Moody's "steadfastly maintained independence as a cornerstone of its business," and "not only proclaimed its independence," but "listed verifiable actions it was taking to ensure its independence," the representations in question were not puffery); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) ("Goldman must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest as mere puffery or statements of opinion."); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (defendants' statements that were more than "rosy predictions or vague statements about Goldman's integrity," and that were allegedly known to defendants to be untrue, were actionable); *see also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (focusing on "context and manner of presentation" in analyzing actionability).

Moreover, defendants' conduct itself was actionable as part of defendants' scheme to defraud investors by concealing their true opinion of the actual risk involved in the RMBS and CDOs S&P rated, as alleged throughout the Second Amended Complaint. *See, e.g.*, Second Amended Complaint, Section VI, "S&P's Scheme To Defraud." Conduct that extends beyond statements or omissions is actionable under §10(b). *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), Opinion & Order (S.D.N.Y. Mar. 27, 2013), at 18 ("the breadth of the 10(b)

statutory scheme is of particular relevance when arguments are made that isolated statements may or may not themselves be actionable").

Five of the new facts, all of which are discussed in the George Declaration, are highlighted below.

> **1.   New Facts: S&P's Slowdown in Rolling Out Its New Ratings Model (E3) and Its Creation of "E3 Low" for Deals that Could Not Pass E3**

The DOJ complaint identifies a newly discovered July 20, 2005 report, entitled "Global CDO Activity Report," sent from Global CDO Managing Director Jordan to Joanne Rose, the Executive Managing Director in charge of Structured Finance.  DOJ complaint, ¶178.  The report stated that "[d]ue to the not insignificant impact on lowly rated (BBB and down) synthetic reference pools . . . we have toned down and slowed down our roll out of E3 [the new rating model] to the market, pending further measures to deal with such negative results."  *Id.*  The newly discovered report further explained: "Bear Stearns pointed out that the potential business opportunities we would miss by effectively having to walk away from such high yield structures would NOT be compensated for by any increase in rating volume for highly rated collateral pools."  *Id.*

Even worse, the DOJ complaint alleges that "S&P developed an alternative version of E3 called 'E3 Low' that had less demanding assumptions than E3, thereby making it easier for a CDO issuer to achieve higher CDO ratings."  *Id.*, ¶181.  According to the DOJ complaint, "E3 Low was not based on historical research or analytical data."  *Id.*  "Rather, the rationale behind this weaker model ***was to achieve the goal of preserving S&P's market share***."  *Id.*  The DOJ complaint alleges new facts that S&P instructed its analysts, "***If the transaction fails E3, then use E3Low***."  *Id.*, ¶184.

This newly discovered information directly contradicts Executive Vice President Tillman's statement to investors on July 24, 2007 – on an investor conference call in which both individual

- 9 -

defendants participated – that "[t]ightening criteria may have an adverse impact on our market share, but we will continue to develop and adjust our criteria to reflect how changing conditions impact credit risk."   Second Amended Complaint, ¶349; *see also* ¶351.   Although she admitted that increasing the stringency of ratings "can in fact have an adverse impact on whether [investment banks] come to Standard & Poor's or not," she nonetheless represented that "that's not what we're concerned about.   We're concerned about calling it as it is."   *Id.*

As the newly discovered report demonstrates, defendants' priority was not adjusting criteria to reflect actual credit risk, whatever the impact on business.   Rather, their focus was on the risk of missing "potential business opportunities."   DOJ complaint, ¶178.   And, if their E3 model was too "demanding," S&P instructed its analysts to "use E3Low."   *Id.*, ¶184.   These compelling new facts require relief from judgment under Rule 60(b).

## 2.   New Facts: July 2007 Internal E-mail Discussing Deals that Would Be Rated and Require Immediate Downgrade

In paragraphs 254-257, the DOJ complaint identifies a newly discovered internal e-mail, sent by an S&P executive on July 11, 2007, documenting that S&P analysts and executives knew the company was rating deals that would have to be downgraded immediately.  George Declaration, ¶37.  The newly discovered e-mail, entitled "'PRIVILIGED [sic] & CONFIDENTIAL – Quick Market Pulse' from CVMs"[7] (*id.*), was sent to Joanne Rose, the Executive Managing Director in charge of Structured Finance, with the opening statement, "Your eyes only for now."   *Id.*

The newly discovered e-mail included a report by two Client Value Managers on the reaction in the CDO market to S&P's "massive CreditWatch actions."   *Id.*  According to the Client Value

---

[7]    "CVMs" are Client Value Managers.

Managers' report in the newly discovered e-mail, "[d]eals that close now will be downgraded if we don't stop them.  This is different from what happened in March.  Deals could close then as people closed their warehouses – but we were not going to immediately downgrade the underlying [RMBS collateral].  In contrast, we will be doing exactly this on Thursday and next week."  *Id.*

This newly discovered e-mail and the attached report directly contradict McGraw's public statements about the "independence" and "integrity" of S&P's "ratings opinions."  Second Amended Complaint, ¶362.  Although McGraw had represented that S&P had "institutional safeguards in place to ensure the independence and integrity of those opinions" (*id.*), executives and analysts within S&P – including the Executive Managing Director in charge of Structured Finance – knew that S&P was rating deals that would have to be "immediately downgrade[d]."  DOJ complaint, ¶254.  Like the "E3Low" facts discussed above, these newly discovered facts provide compelling reasons to grant relief from judgment.

> **3.  New Facts: S&P's "Notching" Policy – and S&P's Decision to Disregard It**

The DOJ complaint identifies newly discovered facts regarding S&P's July 18, 2007 announcement of a new policy for "notching" its own ratings.  George Declaration, ¶¶16-17. "Notching" was S&P's practice of deeming certain tranches of non-prime RMBS "to have lower ratings for purposes of rating CDOs with exposure to them."  *Id.*  Essentially, S&P's "notching" policy was an admission that its RMBS ratings were not accurately capturing the actual risk that the RMBS would default.  To compensate for that failure, S&P adjusted the rating downward to a more accurate level for purposes of rating CDOs exposed to those RMBSs.  According to the DOJ complaint, the "purpose of the policy was to reassure the investing public that S&P had taken into account the possibility of downgrades in underlying RMBS when rating CDOs."  *Id.*

Significantly, however, the DOJ complaint alleges facts – not previously known to plaintiff – that "[w]hen use of notching resulted in a failure of S&P's critical Q-Ramp test, S&P frequently ignored the results and issued an Effective Date RAC anyway, without informing investors that the deal had failed a key S&P test even when notching was applied."[8]   DOJ complaint, ¶266.   In paragraph 267, the DOJ complaint alleges newly discovered facts that, throughout September and the first half of October 2007, S&P analysts reviewed and re-rated hundreds of non-prime RMBS tranches.   Despite the inevitable downgrade of hundreds more RMBS ratings, S&P continued to disregard the prophylactic "notching" policy it had announced in July in issuing and/or confirming (through Effective Date RACs) at least eight ratings for CDOs priced at more than $8.8 billion that were backed by non-prime RMBS.[9]

To give a specific example, the DOJ complaint alleges facts, not previously known to plaintiff, regarding a CDO discussed in the Second Amended Complaint at paragraph 158, the Delphinus CDO.   The DOJ complaint alleges that on the very day that S&P announced its new notching policy, July 18, 2007, it was preparing a closing date rating for the Delphinus CDO, which

---

[8]   To rate CDOs, S&P used a model known as "CDO Evaluator," which determined whether the pool of assets could support the deal's proposed structure.   DOJ complaint, ¶81.   For cash and some hybrid CDOs, analysts would also generate the results of S&P's CDO Evaluator and Genesis cash-flow ("Genesis") models in a summary form referred to as a "Quantitative Ramp" or "Q-Ramp."   *Id.*

Letters from S&P to issuers confirming CDO ratings after post-closing ramp-up was completed were known as "Effective Date RAC letters."   An Effective Date RAC letter confirmed that CDO tranches continued to receive S&P's original ratings after the CDO was fully funded and all of the CDO's underlying assets had been purchased.   The Effective Date RAC letter indicated that, with all underlying assets actually purchased, the CDO tranches continued to satisfy S&P's criteria for the ratings those tranches had previously been given at closing.   *Id.*, ¶¶98-99.

[9]   An Effective Date RAC letter confirmed that CDO tranches continued to receive S&P's original ratings after the CDO was fully funded and all of the CDO's underlying assets had been purchased.   DOJ complaint, ¶99.

contained a large number of subprime RMBS tranches.  George Declaration, ¶17.  The DOJ complaint alleges that, late that afternoon, when S&P analysts ran the Delphinus portfolio through CDO Evaluator (S&P's rating program for CDOs) with full notching, they discovered four CDO tranches that failed the Q-Ramp test.  *Id.*  The analysts then progressively scaled back the notching on subprime RMBS assets until, just after midnight, only one CDO tranche was failing.  *Id.* According to the newly discovered facts alleged in the DOJ complaint, S&P rated Delphinus on July 19, 2007, notwithstanding the continuing Q-Ramp failure of one CDO tranche (even under scaled-back notching).  *Id.*

Quite the contrary of McGraw's Class Period statements about the "independence" and "integrity" of S&P's "ratings opinions" (Second Amended Complaint, ¶362), these newly discovered facts show that there was no integrity to the process at all.  Rather, analysts simply worked to adjust the "nonnegotiable" criteria (*id.*) until they achieved the desired result.  These compelling new facts require relief from judgment.

### 4.   Previously Unavailable Facts: Jordan's and Gillis' Focus on Market Share over Ratings Accuracy

S&P's Head of RMBS Ratings, Frank Raiter, testified at his deposition in *Abu Dhabi* that he repeatedly pleaded with S&P's global head of RMBS, Jordan, and S&P's Chief Quality Officer for Structured Finance Ratings, Tom Gillis, to implement a new, available, and more accurate ratings model.  Raiter testified that they responded, "we already had 94, 95 percent [market share], and it would just be a better model"; "if we're not going to gain more revenue why should we spend the money to do that?"  George Declaration Ex. 6.  This evidence provides new, additional support for the material falsity of numerous of defendants' class period statements, such as McGraw's statement that "[t]ightening criteria may have an adverse impact on our market share, but we will continue to develop and adjust our criteria to reflect how changing conditions impact credit risk."  Second

- 13 -

Amended Complaint, ¶349; *see also* ¶351.  Further, this evidence demonstrates that S&P's most senior managers were involved in the decision not to use an available and more accurate model. These newly available facts are compelling and require relief from judgment.

### 5.    Previously Unavailable Facts: McGraw's Focus on Profits, Not Accuracy of Ratings

Raiter further testified in his *Abu Dhabi* deposition that the "managers" he referenced in his testimony to Congress, where he testified that "profits were running the show," specifically included defendant "Terry McGraw."  George  Declaration, Ex. 5.  Raiter's deposition testimony provides new and more compelling support for McGraw's scienter with respect to the false statement by Tillman that McGraw endorsed – that stringency of ratings "can in fact have an adverse impact on whether [investment banks] come to Standard & Poor's or not, but that's not what we're concerned about.  We're concerned about calling it as it is."  Second Amended Complaint, ¶349; *see also* ¶351. Again, this newly available fact is compelling and requires relief from judgment.

As these five concrete examples (and the others identified in the George Declaration) demonstrate, defendants' statements about the integrity and objectivity of S&P's ratings process were not only categorically and verifiably false, but known by defendants to be false.  As the case law discussed above unequivocally establishes, such representations do not constitute vague opinion or mere puffery, but are actionable statements under the federal securities laws.  *See Moody's*, 599 F. Supp. 2d at 509; *Richman*, 868 F. Supp. 2d at 279-80; *Lapin*, 506 F. Supp. 2d at 240; *Operating Local 649*, 595 F.3d at 92.

### C.    New Facts Demonstrate Both the Falsity and Scienter of Defendants' Statements Regarding S&P's Ongoing Surveillance of Its Ratings

The Second Amended Complaint alleges that, on June 21, 2005, Structured Finance Managing Director Rose – with McGraw listening – told investors that S&P had "a dedicated

surveillance unit to oversee the continuing credibility of our ratings."  Second Amended Complaint, ¶271.  Rose explained, "All ratings are regularly reviewed and our surveillance group back tests our ratings to show their credibility over time."  *Id.*  Similarly, on March 5, 2007, McGraw again told investors that "S&P has [a] fully integrated surveillance process for residential mortgage-backed securities and CDOs."  *Id.*, ¶325.  According to McGraw, tracking the ratings for continued accuracy requires "a lot of monitoring activity."  *Id.*, ¶327.

In dismissing plaintiff's claims based on these and similar allegations, the Court held that defendants' surveillance statements were not alleged with sufficient particularity.  *Reese*, 2012 U.S. Dist. LEXIS 83753, at *4.  The Second Circuit affirmed.  *Boca Raton*, 2012 U.S. App. LEXIS 25989, at *13-*14.  As discussed below (and in the George Declaration), however, newly discovered facts alleged in the DOJ complaint demonstrate that defendants had significant, detailed information about the lack of surveillance over S&P's RMBS and CDO ratings, providing much greater particularity supporting the falsity of their statements.  Given the substantial additional detail that plaintiff can now allege, Second Circuit law strongly favors granting leave to amend the complaint. *See, e.g.*, *Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 276 (2d Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."); *Acito*, 47 F.3d at 55 ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)."); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 590 (S.D.N.Y. 2007) (freely granting leave to replead is "especially appropriate when claims are dismissed under Rule 9(b) because the law favors resolving disputes on their merits"), citing *Acito*, 47 F.3d at 54-55.

Four of the many new facts set forth in the George Declaration, each of which justifies relieving plaintiff from the judgment in this case, are highlighted below.

- 15 -

  1.  **New Facts: Jordan's July 6, 2007 E-mail Describing "Firewall" Blocking Information Between RMBS Ratings and CDOs Impacted by Those RMBSs**

In paragraph 251, the DOJ complaint identifies a newly discovered July 6, 2007 e-mail from Jordan, the Global CDO Managing Director, subsequently forwarded to Rose, the Executive Managing Director in charge of Structured Finance, that flatly contradicts McGraw's statements regarding S&P's "fully integrated surveillance process for residential mortgage-backed securities and CDOs." *Compare* George Declaration, ¶46, *with* Second Amended Complaint, ¶325. In the newly discovered e-mail, Jordan explains, "I'm listening to the RMBS discussion about the dramatic changes we will very soon be making. B/c the planned RMBS changes will result in unprecedented CDO downgrades, ***and currently all of this is firewalled and highly confidential***, I struggle with how to answer these questions." *Id.*

Thus, while defendants told investors that S&P had a "fully integrated surveillance process" between RMBS and CDO surveillance (Second Amended Complaint, ¶325), the hidden internal truth was that there was a firewall between the two. George Declaration, ¶46. These new facts justify relief from the judgment.

  2.  **New Facts: Content of March 19, 2007 Presentation to McGraw, Including Details Regarding Increased Downgrading Activity on Subprime RMBSs, but No Adjustment to CDOs Incorporating Those RMBSs**

In paragraph 233(i), the DOJ complaint alleges facts, not previously known by plaintiff, regarding the March 19, 2007 presentation by Senior Analyst A to defendant McGraw and other McGraw-Hill executives. George Declaration, ¶39. The Second Amended Complaint alleged that such a presentation was planned (Second Amended Complaint, ¶148), but plaintiff did not have access to the full content of the presentation. George Declaration, ¶39.

According to DOJ complaint, the presentation was entitled "Structured Finance Ratings: Overview and Impact of the Residential Subprime Market." *Id.* The DOJ complaint describes a portion of the presentation by Senior Analyst A, captioned "Impact of Subprime on CDOs," in which Senior Analyst A told McGraw and other executives about the percentages of subprime RMBS in various types of CDOs. *Id.* Specifically, the DOJ complaint alleges that McGraw and others were informed that RMBS CreditWatch placements and downgrades undertaken up to that point in 2007 had not yet led to any downgrades of CreditWatch placements on S&P's CDO ratings. *Id.* Thus, McGraw was directly advised about the "firewall" disconnect of information.

In addition, according to the DOJ complaint, the analyst told McGraw and others that the 2002-2004 vintage RMBS were seeing increased downgrade activity, and that those notes were part of CDOs issued in 2005 and before. *Id.* In his presentation, Senior Analyst A told McGraw, "There will be some impact to CDOs as RMBS has been a growing source of collateral." *Id.* The DOJ complaint also alleges that Executive F sent the presentation to Gillis and Jordan, among others, on March 26, 2007 (DOJ complaint, ¶233(q)), and that Jordan forwarded the presentation to David Tesher, a Managing Director of Structured Finance Ratings and Cash CDOs (Second Amended Complaint, ¶96), that same day. *See* DOJ complaint, ¶233(q).

Thus, the fact that S&P was not incorporating what it knew about RMBS ratings into the ratings of CDOs populated by those RMBSs was widely disseminated throughout S&P. These additional newly discovered facts require relief from the judgment.

> **3.    New Facts: Internal Report, Entitled "RMBS & CDO Surveillance Weekly Subprime Update," Including Facts Such as Actual RMBS Default Rates of 35%-56.27%, When S&P Continued to Use Assumption of 3% RMBS Default Rate to Rate CDOs**

In paragraph 239(c), the DOJ complaint identifies yet another report heretofore unknown to plaintiff.  George Declaration, ¶42.  The DOJ complaint alleges that Executives F and G sent the newly discovered report, entitled "RMBS & CDO Surveillance Weekly Subprime Update" (dated June 11, 2007), to, among others, Rose, Gillis, Jordan, Tesher, Bryan (Managing Director in charge of the Synthetic CDO group),[10] and Senior Analyst A.  George Declaration, ¶42.

According to the report, "analysts had run all of S&P's 18,000 subprime RMBS ratings and found that, on average, the BBB and lower tranches of subprime RMBS had greater than 100% severe delinquencies versus available credit support."  *Id.*  "This was double the 50% [severe-delinquencies-versus-credit-support] ratio that, in February 2007, RMBS Surveillance had suggested be used for reviewing RMBS tranches for placement on CreditWatch Negative."  *Id.*  Moreover, S&P analysts and executives knew that a severe-delinquencies-versus-credit-support ratio in excess of 100% "meant that the RMBS tranche at issue would in the near term almost certainly be subject to a negative Rating Action."  *Id.*

Similarly, in paragraph 235(d), the DOJ complaint identifies an analysis, previously unknown to plaintiff, of 2005 and 2006 vintage subprime RMBS by an S&P analyst.  George Declaration, ¶36.  According to the DOJ complaint, Analyst F (in RMBS) forwarded the analysis to Executives C and I, Senior Analyst A, and others.  *Id.*  "Using even the conservative expected losses

---

[10]    *See* George Declaration, ¶15.

projected by S&P for these vintages, this analysis showed average defaults of investment grade RMBS that vastly exceeded S&P's expectations." DOJ complaint, ¶235(d).

Specifically, for BBB tranches, the analysis showed average defaults of 47.44% for RMBS rated in 2005, 56.27% for RMBS rated during the first half of 2006, and 35% for RMBS rated during the second half of 2006. George Declaration, ¶36. By comparison, at that time CDOs were being rated with the assumption that the BBB RMBS assets they contained had an average default rate of approximately *3%*. *Id.*

Thus, according to the newly discovered facts, Executives F and G, Rose, Gillis, Jordan, Tesher, Bryan, and Senior Analyst A all knew that CDOs were being rated based on an assumption that 3% of the BBB tranches of RMBS would default – when the internally available information showed that one third to one half of those tranches were defaulting. *Id.* These facts, considered together with the internal memorandum showing a 100% severe delinquencies ratio, are extremely compelling and require relief from the judgment.

**4.    New Facts: Executive F Regularly Told Colleagues She Was Prevented by Gillis and Other S&P Executives from Downgrading Subprime RMBSs Because of Market Share Concerns**

In paragraph 211, the DOJ complaint alleges the fact, previously unknown to plaintiff, that "[b]eginning in or about Fall 2006 and continuing through in or about Spring 2007, Executive F regularly expressed frustration to her colleagues that, notwithstanding the dire performance of subprime RMBS, she was prevented by Gillis and other S&P executives from downgrading the ratings of subprime RMBS because of concern that S&P's ratings business would be affected if there were severe downgrades." George Declaration, ¶38.

This new allegation is consistent with many others, confirming that defendants were driven by a desire for market share – not integrity of ratings or accuracy of surveillance. *Id.* Again, these

- 19 -

825162_1

new facts are compelling and require relief from the judgment, especially given the Second Circuit's disposition to permit amendment when the dismissal was on particularity grounds.  *See, e.g.*, *Olsen*, 136 F.3d at 276; *Acito*, 47 F.3d at 55; *Miller*, 473 F. Supp. 2d at 590.

    **D.**    **Plaintiff Diligently Investigated the Available Facts in Drafting the Second Amended Complaint, but Did Not Have Access to or Could Not Use the Compelling Facts Now Presented**

Plaintiff and its counsel exercised enormous diligence in investigating and pleading plaintiff's claims.  George Declaration, ¶¶49-61.  Despite hundreds of hours of lawyer and private investigator time searching for detailed facts to support plaintiff's claims, 65 witness interviews, and a full review of the Senate Subcommittee's investigation, which itself included more than a million documents and more than 100 interviews and depositions, plaintiff's counsel did not discover the new facts alleged in the DOJ complaint, and could not use the testimony from the *Abu Dhabi* litigation.  *Id.*

In addition to their own thorough investigation, plaintiff's counsel served a Freedom of Information Law request on the New York Attorney General's office for documents and interview transcripts related to the Attorney General's office's investigation of McGraw-Hill, as well as a Freedom of Information Act request on the U.S. Securities and Exchange Commission ("SEC"), seeking access to any information the SEC provided to the Senate Subcommittee regarding McGraw-Hill and S&P.  George Declaration, ¶¶55, 59.  Plaintiff's counsel also moved to lift the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 in order to obtain documents that McGraw-Hill and S&P might have provided to the SEC.  *Id.*, ¶56.  Further, plaintiff's counsel met with the Assistant U.S. Attorneys who were investigating McGraw-Hill and requested that they share any additional information they had discovered.  *Id.*, ¶61.  None of these

efforts uncovered the documents and allegations now revealed in the DOJ complaint, nor made it possible for plaintiff to use the sealed testimony from the *Abu Dhabi* litigation.

The George Declaration specifically details precisely what newly discovered facts are alleged in the DOJ complaint and what newly available facts have been unsealed from the *Abu Dhabi* litigation – and that they could not have been obtained sooner with due diligence. *Id.*, ¶¶6-48. This motion highlights a number of those facts by way of example and explains their relevance to plaintiff's claims. Because plaintiff's counsel have acted with nothing but extreme good faith and diligence in investigating plaintiff's claims, this Court should grant the relief requested. *Kotlicky*, 817 F.2d at 9.

## III. CONCLUSION

In light of: (1) the government's historic, dramatic and detailed allegations charging McGraw-Hill and S&P with a massive fraud that resulted in more than $5 billion in harm; (2) the highly convincing new facts disclosed both in the DOJ Action and in the recently unsealed discovery in *Abu Dhabi*; and (3) the due diligence and good faith with which plaintiff has acted, plaintiff requests that this Court grant relief from final judgment pursuant to Rule 60(b)(2). Further, pursuant to Fed. R. Civ. P. 15(a) and (d), plaintiff requests permission to file its [Proposed] Third Amended Complaint. *Foman*, 371 U.S. at 182.

DATED:  March 28, 2013            ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                  DAVID J. GEORGE
                                  ROBERT J. ROBBINS


                                  _____
                                        */s/ David J. George*
                                        DAVID J. GEORGE

- 21 -

825162_1

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
dgeorge@rgrdlaw.com
rrobbins@rgrdlaw.com
ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARK T. MILLKEY
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mmillkey@rgrdlaw.com
eboardman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SUSAN K. ALEXANDER
ANDREW S. LOVE
Post-Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA   94104
Telephone:  415/288-4545
415/288-4534 (fax)
salexander@rgrdlaw.com
alove@rgrdlaw.com

Lead Counsel for Plaintiff

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff

- 22 -

## CERTIFICATE OF SERVICE

I, David J. George, hereby certify that on March 28, 2013, I caused a true and correct copy of the following documents to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice:

Notice of Plaintiff's Motion for Relief from Judgment Under Rule 60(b) and for Leave to Amend Complaint Under Rules 15 (a) and (d);

Plaintiff's Memorandum of Law in Support of its Motion for Relief from Judgment Under Rule 60(b) and for Leave to Amend Complaint Under Rules 15 (a) and (d); and

Declaration of David J. George in Support of Plaintiff's Motion for Relief from Judgment Under Rule 60(b) and for Leave to Amend Complaint Under Rules 15 (a) and (d).

_/s/ David J. George_
DAVID J. GEORGE